

ENTERED
02/15/2008

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| RICHARD D GILBERT | § | CASE NO: 07-30933 |
| Debtor(s) | § | |
| | § | CHAPTER 7 |
| | § | |
| GRADEY CALDWELL, *et al* | § | |
| Plaintiff(s) | § | |
| | § | |
| VS. | § | ADVERSARY NO. 07-3242 |
| | § | |
| RICHARD D GILBERT | § | |
| Defendant(s) | § | |

### MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW, FOLLOWING TRIAL OF ADVERSARY PROCEEDING; SETTING HEARING ON AWARD OF ATTORNEYS FEES

Gradey Caldwell and Eastex Square, Inc. ("Plaintiffs") filed a complaint commencing this adversary proceeding. Plaintiffs contend that Richard Gilbert ("Debtor") is indebted to them for improper conduct while an officer and director of Eastex Square, Inc. and that the debt is not dischargeable in bankruptcy. For reasons set forth below, and by judgment issued this date, the relief requested in the complaint is denied and the complaint is dismissed.

### I.   FACTS

Jerry Jones is a certified public accountant who practices in Houston, Texas, under the name Jerry Jones & Associates. Jones met Debtor about 1994 or 1995 when Debtor was operating an Aaron's Rental Store and a real estate business named GP Realty and Management. Jones' wife was Debtor's bookkeeper, and Jones approached Debtor to go into business together. Jones plan was to create opportunities for investments in rental businesses as tax advantaged investments for his high income accounting clients who needed tax relief.

One of those investors was Dr. Clive Fields, ("Fields"). About 1997 Fields purchased a 1/3 interest in JFG Enterprises and a 1/3 interest in Eastex Square, Inc. ("Eastex"). The co-owners of those enterprises were Jones and Debtor, who each owned 1/3.

Eastex purchased a strip shopping center that was in foreclosure in Beaumont, Texas. Initially, Jones managed the real estate. It had two tenants, Aarons Rental and Farmer's Insurance.

Jones managed the property from 1997 until 2000. During that period, Eastex paid Jones a $1,000 per month "management fee" and paid an equal management fee to Debtor. In 2000, Jones informed Debtor that Jones' tax practice was taking so much of Jones' time that Debtor should manage the Eastex property, and Debtor obliged by undertaking management of the property through his company, GP Realty.

In addition to Eastex and JFG, Jones and Debtor were involved in about 4 other businesses. In each case, an investor was brought to the deal by Jones. Debtor had had no contact with the investor prior to the investment. Eventually the other investors in almost all the other entities brought suit against both Jones and Debtor for fraud. There was no evidence of the details of those suits except for the Fields' judgment which is discussed in more detail below.

Debtor and Jones purchased a boat, or yacht, together. Each owned 50%. They agreed to equal responsibility for payment of the purchase money note and the expenses. However, Jones did not always pay his share, and Debtor initially paid some of Jones' share of the note or expenses. In 2001 Jones directed Debtor to pay the boat note and expenses out of the Eastex bank accounts, and Debtor began to do so.

In 2001 Fields informed Jones and Debtor that Fields wanted to terminate his investments in Eastex. Debtor and Jones acquired Fields' interest and became equal 50% owners of Eastex. On September 1, 2001, Jerry Jones & Associates leased space from Eastex.[1] The Jerry Jones & Associates lease provided that initially Jerry Jones & Associates would pay only its share of Common Area Maintenance (CAM) fees and would not pay base rent until later in the lease. However, Jerry Jones & Associates never paid CAM and never paid rent.

On January 14, 2002, Jones faxed a letter to Debtor.[2] The letter Jones asserts:

1. That he and Debtor had agreed that Jones was to receive $2,000 per month from the Eastex property commencing 10/1/01. The letter complains that Jones has not received the payment.
2. That Eastex should have sufficient cash to pay the boat note and also to allow Jones and Debtor to draw $1,000 to $1,500 per month from Eastex.
3. That Jones will not pay rent to Eastex "until the above situation is resolved".

On January 23, 2002, Debtor wrote to Jones acknowledging Jones' January 14 fax and demanded that Jones pay his delinquent rent.[3] Debtor denied an agreement to pay Jones $2,000 per month from Eastex, refused to pay Jones $2,000 per month, set out the CAM expenses and Jones' share of those, declared a default on Jones' lease, and demanded payment of Jones' rent.

On March 30, 2003, Debtor wrote a letter to Jones asserting:

1. That Eastex was losing money each month, in part because Jerry Jones & Associates was not paying its rent.

---

[1] Debtor's Exhibit 6, second paragraph, second sentence.
[2] Debtor's Exhibit 6.
[3] Debtor's Exhibit 7.

      2.      That Debtor wanted to sell the boat and the Eastex property, and encouraged Jones to agree to reduce the price to an amount that Debtor thought was a reasonable sales' price.

      3.      That Debtor wanted to disentangle his and Jones' business interests, but insisted on a complete disentanglement to avoid alleged problems (alluded to but not clearly explained) such as Debtor had encountered with Lake Charles, La. investments in which Debtor was also involved with Jones.

      4.      That Debtor acknowledged Jones' right to access to Eastex financial records at any time and offered to fax bank statements to Jones upon request.

      5.      That Debtor refused to agree to make Jones a signatory on the Eastex bank account at Sterling Bank because Debtor asserted that Jones had embezzled funds from Eastex when Jones was a signatory on Eastex's prior account at Community Bank.[4]

Eastex began to fall behind on payment of its real property taxes in 2004. Debtor arranged a payment plan with Jefferson County and was performing on that payment plan adequately to keep Jefferson County from selling the property at tax sale.

On June 24, 2004, Jones sent a fax to Debtor instructing Debtor, for Eastex, as follows:[5]

      1.      Do not pay any debt from Eastex unless the payment is ordered by the Court.
      2.      Do not pay boat expenses or debt obligations from Eastex.
      3.      Pay the delinquent Eastex property taxes

On July 5, 2004, Debtor responded as follows:

      1.      That the boat expenses were $1,997.47 per month (or $998.73 for each Jones and Debtor).
      2.      That Debtor would pay the boat expenses individually, and not from Eastex accounts, if Jones would provide his half of the money by the 10th of the month.

There is no indication that Jones ever replied to Debtor's letter, and Debtor continued to pay the boat expenses from Eastex's funds.

Hurricane Rita severely damaged the property in 2005. Debtor undertook substantial effort to negotiate an insurance settlement and then to engage contractors to repair the damage. All insurance proceeds were paid into Eastex bank accounts. However, before the contractors were paid, the Fields collection efforts began.

As noted above, Dr. Fields obtained a judgment against both Jones and Debtor for damages related to fraud. On February 22, 2005, Fields obtained a TRO (followed by a preliminary injunction) to execute on that judgment. The injunctive relief prohibited Debtor

---

[4] Debtor testified at length about this embezzlement and provided copies of the checks as part of his testimony. That testimony was credible and unrebutted.
[5] Plaintiff's Exhibit 5.

> … from paying, disbursing, spending, moving, or secreting …
> [funds from Eastex's Sterling Bank account] with the exception of
> payments in the normal course of business when notice of any and
> all payments over $100 is given to counsel for Dr. Fields."

It is important to note that the order does not require the consent of Dr. Field's counsel and does not require court authority to pay "normal course of business payments" in excess of $100. The order only requires notice to Dr. Fields' counsel.

Plaintiff contends that Debtor issued approximately 28 checks that allegedly violated that injunction.[6] Debtor contends that the checks were for "normal course of business" payments, for reimbursement of travel expense between Houston and Beaumont,[7] for management fees of $1,000 per month[8], and for boat expenses. Finally, one payment was a commission for finding a new tenant.

Debtor's testimony and exhibits introduced from the period prior to 2005 clearly demonstrated that the management fee paid in 2005 was simply the continuation of long established business practices and was thus "normal course of business." The amount was reasonable and customary. Jones' testimony (that the management fee was unreasonable) is simply not credible in light of the evidence that Jones paid twice that sum when he managed the property and in light of the fact that substantial additional management work was necessary in 2005 because of damage caused by hurricane Rita. The $90 reimbursement for travel to and from Beaumont is both *de minimis* and reasonable under these circumstances. All sums in excess of $100 were noticed to Dr. Fields' counsel who did not object or seek court assistance to prohibit the expenditure.

Payment of the boat note and expenses was clearly a continuation of the normal course of business for this entity. These payments might not have been expenditures for the business or for the benefit of the business, but the order did not limit payments to "expenses." It allowed "payments in the normal course of business," provided only that advance notice was given to Dr. Fields' counsel. Advance notice was given, and there was no objection or attempt by Dr. Fields to prohibit the payments. An accountant or a tax lawyer might classify these payments as dividends or simply as withdrawals from the business by the equity owners.[9] Plaintiffs make much ado about the 2004 fax from Jones to Debtor telling Debtor to stop making the boat payments. The Court finds this argument to be unavailing for two reasons. First, the fax was followed by a communication from Debtor to Jones that gave Jones an alternative for payment of the boat note and expenses, and Jones apparently ignored the alternative, with the clear implication that payments were to continue to be made from Eastex. Second, the payments were indeed made by Eastex for over a year after Jones' fax without complaint from Jones. Jones clearly acquiesced in Debtor's action.

---

[6] Plaintiff's Exhibit 7, and Exhibits 9 through 34.
[7] At about $90 each (one check is $97).
[8] With payments of multiple $1,000 fees in some months and none in others.
[9] Plaintiff's counsel actually suggested a plausible reason why Dr. Fields' counsel did not object. The suggestion was that Dr. Fields was attempting to seize and sell all of Jones' property and all of Debtor's property to satisfy his judgment. Dr. Fields' counsel might have considered the payment of the note and other expenses to be reasonable to preserve this asset in case it had value that Dr. Fields' might seize and sell.

The payment of the lease commission was also clearly appropriate. Lease commissions are ordinary course of business expenditures, and Eastex had paid lease commissions to third parties prior to the payment to GP Realty. The new lease was possible after Debtor's much delayed eviction of Jerry Jones & Associates from the premises (for nonpayment of rent). The new lease substituted a paying tenant for one who did not pay. Dr. Fields' counsel was given notice of the payment of the commission, and he did not object.

In January, 2006, the state court appointed a receiver, who took possession of the Eastex stock and assets for the benefit of Dr. Fields. Debtor testified that substantial money (principally from insurance proceeds related to hurricane Rita) was in the checking account when the turnover occurred. There is no contrary evidence in the record. Both Debtor and Jones testified that the receiver was inept and incompetent. The receiver failed to pay contractors, causing the contractors to deny warranty claims. There is no accounting for funds received and expended by the receiver.

In April, 2006, the receiver forced the sale of both Jones' and Debtor's Eastex stock to Gradey Caldwell, one of the plaintiffs in this adversary proceeding. Debtor had no contact with Caldwell. There is no evidence in the record that the receiver undertook reasonable marketing efforts to market the stock. Caldwell testified that he asked the receiver for information about Eastex, and the receiver refused to provide the information. Caldwell did not do a lien search on the property (other than the title examination required by the lender) and there is no evidence that Caldwell did any investigation before signing a note in excess of $1 million to acquire the property.

Caldwell is Jones' friend of about 10 years. The most reasonable conclusion from the evidence in the record is that Jones introduced his friend Caldwell to the opportunity to purchase Eastex, just as Jones had introduced Fields and Jones' other clients to investment deals. Jones provided Caldwell with information about Eastex, and there is no evidence that Caldwell obtained information from any other source. Jones seems to be Caldwell's sole source of information about the purchase of Eastex. Jones is certainly Caldwell's current source of the allegations that Debtor abused his power with the corporation. All facts were available to Jones prior to the purchase, and therefore the Court is relatively confident that those facts were available to Caldwell before the purchase. Therefore Caldwell's allegations that he was surprised at the nonpayment of real property taxes and the lack of funds in the corporation do not ring true.

The complaint in this adversary proceeding alleges that Debtor misused his corporate authority to pay Eastex funds to himself to the detriment of the corporation. The Court finds those allegations to be unsupported by the evidence. First, the real substance of Caldwell's allegation of harm to Eastex is that the unpaid property taxes were higher than Caldwell expected them to be and that there was less money in Eastex's bank account than Caldwell expected there to be. That conclusion seems to be based on information that Jones provided to Caldwell about Eastex's rents and expenses. The evidence is inadequate. There is no evidence of how much money was in Eastex's bank accounts in January 2006 when the funds were turned over to the receiver and there is no accounting from the receiver. Jones' expectations may have been

disappointed, but there is no evidence that his expectations were realistic or that Debtor was responsible for any shortfall that may have been. Second, Caldwell's allegation of harm to Eastex is based on the contention that Debtor's expenditures of Eastex funds in 2005 (the 28 checks) violated the state court injunction and were unreasonable, unnecessary, unauthorized expenditures for Debtor's benefit rather than for the benefit of Eastex. The Court has found, as fact above, that those allegations are simply unsupported by the evidence.

## II.  CONCLUSIONS OF LAW

Since the Court finds that the evidence is insufficient to support the allegations that Debtor's conduct was inappropriate, the Court finds that Eastex and Caldwell have no claim. Since they have no claim, the Court need not reach the issue of whether that claim is dischargeable.

But if the Court were required to reach the issue of dischargeability of a claim based on the debtor's actions, the Court would find that the claim were dischargeable. To prove that a claim is not dischargeable in this case, the Plaintiffs would have to show that Debtor's conduct:

>  1. Amounted to fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. Since Debtor made no statements or representations to Eastex or to Caldwell, the Court need not address the other elements of fraud. Since the Court cannot find evidence proving by a preponderance of the evidence any wrongful act while acting as an officer or director of Eastex, the Court cannot find defalcation while acting in a fiduciary capacity, embezzlement, or larceny.
>  2. Constituted willful or malicious injury by the debtor to another entity or to the property of another entity. Since there is no evidence of any kind of contact of any kind between Debtor and Caldwell, the Court cannot find that Debtor injured Caldwell or his property. Since the Court cannot find evidence providing by a preponderance of the evidence any wrongful act while acting as an officer or director of Eastex, the Court cannot find willful injury to Eastex.

At the conclusion of trial on February 13, the Court was aware that Debtor had asked for attorneys fees and costs if he prevailed in the litigation. The Court assumed that Debtor based that demand on Bankruptcy Code § 523(d) and the Court announced that it would award fees and costs because Debtor had prevailed. In the course of writing this opinion, however, the Court has re-read section 523(d) and concludes that the section is not applicable. Section 523(d) provides

> If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) … and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs…

This action was brought under § 523(a)(4) and (6), not subparagraph (2). In addition, the debt alleged is not a consumer debt. Therefore, the Court's initial statement about awarding costs under §523(d) was incorrect and is corrected here.

Debtor demanded attorneys' fees in his answer, procedurally correctly under FRBP 7008(b).  As stated at trial, the Court concludes that Plaintiffs' complaint was not substantially justified, but the Court does not find that the complaint was filed in violation of Rule 9011 of the Federal Rules of Bankruptcy Procedure.  If Debtor can point to appropriate law that entitles him to an award of attorneys' fees under those circumstances, the Court will make the award.

By separate judgment issued this date, the complaint is dismissed with prejudice.  Debtor must file a memorandum of authorities for an award of attorneys' fees.  That memorandum must be filed by February 28, 2008.  Plaintiff may file a response if the response is filed by March 7, 2008.  The Court will hold a hearing on the award of attorneys fees.  That hearing will take place on March 11, 2008, at 9:30 AM.

SIGNED 02/15/2008.

_____
Wesley W. Steen
United States Bankruptcy Judge